# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4230 | **DATE** | 3/20/2003 |
| **CASE TITLE** | Brennan-Kenyon vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   **Enter memorandum opinion and order on plaintiff's motion for summary judgment. Plaintiff's motion for summary judgment is granted. Commissioner's cross motion for summary judgment is denied. This cause is hereby remanded to the Commissioner of Social Security for further proceedings consistent with this opinion. Judgment is entered pursuant to Rule 58 F.R.C.P. remanding case to U.S. Agency.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | 3 | |
| ✓ | Notices mailed by judge's staff. | | | number of notices | |
| | Notified counsel by telephone. | | | MAR 21 2003 | |
| | Docketing to mail notices. | | | date docketed | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 3/20/2003 | |
| SM | courtroom deputy's initials | | | date mailed notice | |
| | | | | SM | |
| | | | | mailing deputy initials | |

number of notices

MAR 21 2003

date docketed

3/20/2003

date mailed notice

Document Number

20

U.S. DISTRICT COURT
CLERK
03 MAR 20 PM 4:44

Date/time received in central Clerk's Office

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LINDA S. BRENNAN-KENYON, )
)
Plaintiff, )
)
v. )  Case No. 02 C 4230
)
JO ANNE B. BARNHART, )  Magistrate Judge Ian H. Levin
Commissioner of the Social Security )
Administration, )
)
Defendant. )

DOCKETED
MAR 2 1 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda S. Brennan-Kenyon ("Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) for judicial review of the final decision of the Commissioner of the Social Security

Administration (the "SSA") denying her application for Disability Insurance Benefits ("DIB") under

the Social Security Act (the "Act"). Before the Court is Plaintiff's Motion for Summary Judgment

or Remand and Defendant's Motion for Summary Judgment in the cause. For the reasons set forth

below, the Court remands the cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On August 24, 1999, Plaintiff applied for DIB[1] alleging that, as of April 1, 1996, she became

disabled.[2] (R. 26-27, 47-49.) Plaintiff's application for benefits was initially denied on October 15,

1999. (R. 28.) Subsequently, on November 23, 1999, Plaintiff's request for reconsideration was also

---

[1]Plaintiff has a date last insured ("DLI") of September 30, 2003. (R. 57.)

[2]References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

2D

denied. (R. 36.) Plaintiff then filed a timely request for an administrative hearing and, on February 29, 2000, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 40, 198-228.) There was no testimony, however, from either a Vocational Expert or Medical Expert. (R. 198.)

On January 23, 2001, the ALJ issued his decision finding that Plaintiff was not disabled because she has the residual functional capacity ("RFC") to perform her past relevant work. (R. 17-24.) Plaintiff then filed a request for review of the ALJ's decision, and, on April 24, 2002, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 6, 10.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I.  PLAINTIFF'S BACKGROUND/TESTIMONY

Plaintiff's allegations of disability are based *inter alia* on the following conditions: degenerative disc disease; low back, neck and knee pain; major depression; and cervical spondylosis.[3] (R. 100, 101, 104.)

Plaintiff was born on April 11, 1949, and was fifty-one years old at the time the ALJ issued his decision. (R. 14-24.) Plaintiff graduated from high school, attended college for one year, and received specialized training as a travel agent. (R. 68.)

Plaintiff began working as a waitress, bartender and hostess in 1984. (R. 75-76.) In 1998, Plaintiff worked as a mail carrier for approximately one month. (R. 75, 77.)

---

[3]Cervical spondylosis entails "degenerative changes in the intervertebral disk and annulus with formation of bony oseophytes that narrow the cervical canal or neural formation." *The Merck Manual* at 1490 (17th ed. 1999).

Plaintiff testified, that in early 1996, while employed as a waitress, bartender and hostess at Fellinis Restaurant, she worked "full weeks" which she defined as working "maybe 3, 4 days" up to thirty or more hours per week.[4] (R. 202-05.) She stated that, at that time, she worked mostly lunch shifts because she "couldn't handle [working] the heavy dinners." (R. 204, 207.) Plaintiff stopped working on April 1,1996 because she felt her body was starting to deteriorate and that after a day of work, the next day, she "could hardly move." (R. 204.) Starting in June 1996, however, Plaintiff returned to Fellinis Restaurant where she worked a reduced schedule of only two to three days per week.[5] (R. 206-07.) Plaintiff testified that she reduced the number of hours she worked because of pain in her neck, back and knees. (R. 204.)

At the administrative hearing, Plaintiff stated that she was currently working at Fellinis Restaurant as a waitress, but that she only worked two days a week (four hours each day). (R. 162, 207, 210.) She indicated that she was working "[two] heavy dinners" on the weekends because she made more money working at dinner time.[6] (R. 206-08.) Plaintiff testified that she does not lift anything heavy[7] because her back will go out and she has the bus boys bring the large trays of food to the tables. (R. 210, 220.) She indicated that she could lift "maybe a glass or something to put it

---

[4]On Plaintiff's Work History Report, she reported that prior to 1996, she worked eleven to twelve hour shifts, six days per week. (R. 76.)

[5]Plaintiff indicated that she had been working on and off since April 1, 1996. (R. 205-06.)

[6]Plaintiff made $4,924.00 in 1996; $4,278.00 in 1997; $1,121.12 in 1998; and $5,353.52 in 1999. (R. 18.)

[7]When the ALJ asked Plaintiff if she was lifting fifteen pounds [at work], she stated that "I'm not even going to try to lift anything because I know my back will go out if I lift anything heavy. I wouldn't even attempt to lift [heavy] things." (R. 210.)

3

on."[8] (R. 210-11.) Plaintiff takes the customers' orders, places the orders, and brings the soup and

salad to the table because these were "small little dish[es]."[9] (R. 219-20.) She indicated that during

her four hour shift, she was on her feet, "[t]he whole time" and "[she] never had a break . . . even on

the full time times." (R. 220-221.) After a four hour shift, Plaintiff has pain all over, numbness, and

collapses because she cannot do anything more than recuperate before working her shift, the next

day. (R. 221-22.) Plaintiff stated that she is "beat up" after working, her body is very sore and she

is never able to recover. (R. 222.)

Plaintiff testified that she has difficulty sitting for long periods because her back stiffens up

to the point where she cannot straighten up and her right knee bothers her. (R. 209.) She cannot

walk more than one-half of a block because she can "hardly move [her] back and [her] knee

together." (R. 209, 227.) Plaintiff further stated that she cannot walk too far or stand too long

without triggering pain in her lower back, neck and right knee. (R. 209-10.) Plaintiff refrains from

bending over, stooping and crouching and, moreover, her pain is constant whether she is standing,

sitting or walking. (R. 209-11.) Furthermore, Plaintiff moves around when she is seated because

she is uncomfortable and she is unable to sit on a stool or alternate between sitting and standing

without pain. (R. 226-28.)

In November 1999 and January 2000, Plaintiff indicated that she saw a counselor for

depression. (R. 218.) She testified that she took Zoloft[10] "off and on" for her depression. (R. 227.)

---

[8]Plaintiff testified that if she had to lift a gallon of milk, she could do so once a day. (R. 215.)

[9]Plaintiff worked four or five tables, the same number of tables as the other waitresses. (R. 220.)

[10]Zoloft is indicated for the treatment of major depressive disorder. In its indications and usage section, it states that "a major depressive episode (for which Zoloft should be prescribed)

Plaintiff further testified that while she had health insurance coverage, her deductible was very high. (R. 219.)

With regard to Plaintiff's daily activities of living, she testified that she cooks, does light household chores (e.g., laundry) and shops. (R. 212-14.) Plaintiff stated that she shops for food because it is hard for her to go out to a restaurant since she cannot sit for very long. (R. 212.) She testified that other than shopping she essentially stays at home. (R. 212-13.) Plaintiff stated that she no longer participated in sports or bowled and she could not remember the last time she went to a movie. (R. 212-13.) Moreover, she indicated that a movie is too long to sit through and that she preferred to watch television at home because that way she could lay down or move around. (R. 212-13.) Plaintiff further testified that she attends to her personal hygiene; however, it is difficult for her to take a shower and get dressed. (R. 212.) She stated that she drives only about five miles per week because it is hard for her to get out of the car due to her back problems. (R. 211.) Plaintiff further indicated that her daughter comes to visit once a month and helps her take care of things. (R. 213-14.)

## II.    MEDICAL EVIDENCE

In April of 1996, Plaintiff was involved in an automobile accident. (R. 100.) On May 29, 1996, Dr. Samar S. Jaglan, M.D. (orthopaedic surgeon) evaluated Plaintiff for back and neck pain caused by a jarring trauma from the accident. (R. 100.) In his medical assessment of Plaintiff, Dr. Jaglan noted that Plaintiff had previously incurred injuries to her back and neck which had caused occasional discomfort, but subsequent to the accident, she has had progressive pain in her lower back

---

implies a prominent and relatively persistent depressed or dysphoric mood that usually interferes with daily functioning." *Physicians Desk Reference* 2752 (56th ed. 2002).

and cervical spine area. (R. 100.) Plaintiff's physical examination revealed that her range of motion in her lumbar spine was fairly well preserved. (R. 100.) Moreover, Dr. Jaglan noted that Plaintiff's cervical spinal range of motion was fairly normal and she had normal forward bending, extension and rotation. (R. 100.) Plaintiff experienced pain when turning her neck to the right; however, Dr. Jaglan did not note any weakness. (R. 100.) Plaintiff's muscles were normal in strength and her reflexes were in tact. (R. 100.) Furthermore, her grip strength and elbow flexion/extension and wrist flexion/extension were normal. (R. 100.) Plaintiff was able to walk on her tip toes and heels. (R. 100.)

At the direction of Dr. Jaglan, Plaintiff underwent an X-ray evaluation of her lumbar and cervical spines. (R. 100.) Plaintiff's lumbar spine X-ray revealed some mild degenerative changes and anterior spur and osteophytes. (R. 100.) An X-ray of Plaintiff's cervical spine, however, revealed moderate to severe disk degeneration of the C5-6 interval with osteophyte spurring, narrowing of the disc and posterior osteophyte formation. (R. 100.) Dr. Jaglan diagnosed Plaintiff as suffering from cervical spondylosis with disc degeneration of C5-6. (R. 101.) Dr. Jaglan recommended that Plaintiff continue with activity, physiotherapy, range of motion exercises, and use anti-inflammatory medication. (R. 101.)

On January 4, 1999, Plaintiff saw her treating physician, Dr. Samuel Goldstein, M.D. and underwent a comprehensive physical examination. (R. 166.) At that time, Plaintiff reported that she was generally feeling fine, but that she had occasional back pain. (R. 21, 166.) Dr. Goldstein's clinical findings revealed that Plaintiff did not have any pain or swelling in her neck. (R. 166.) Dr. Goldstein further noted that Plaintiff did not have joint pain or swelling, muscle spasms, weakness, or difficulty walking. (R. 166.) Plaintiff's sensory responses and reflexes were also in tact. (R. 166.)

6

On September 10, 1999, Plaintiff underwent an X-ray of her lumbosacral spine which revealed mild degenerative disease, disk space narrowing at L3-S1 and mild demineralization. (R. 105.)

Dr. Michael T. Wagner, M.D., a state consultative examiner, performed a psychiatric evaluation of Plaintiff on September 10, 1999. (R. 102-04.) Plaintiff stated that her husband had died five years ago and since that time she had been very depressed. (R. 102.) Plaintiff reported that for the past five years she had had a depressed mood much of the time, anhedonia,[11] excessive guilt over her husband's death, fatigue, insomnia, and decreased concentration. (R. 102.) Plaintiff further stated that she had previously taken Zoloft for her depression and that she saw a psychiatrist and therapist in 1997 for her depression. (R. 102.) In addition, Plaintiff indicated that she has significant neck and back pain due to a spinal degenerative disk disease. (R. 102.)

With respect to her daily activities, Plaintiff told Dr. Wagner that she only does what she has to do and that she is somewhat able to cook, clean, shop and do laundry. (R. 103.) Plaintiff reported having many friends and that she occasionally goes to movies and restaurants. (R. 103.) She stated, however, that she spends the majority of her day in her home doing housework. (R. 103.) Plaintiff also indicated that she worked two days per week as a waitress. (R. 103.) In his assessment of Plaintiff, Dr. Wagner determined that Plaintiff's poor motivation and depressive symptoms impaired her daily activities. (R. 103.)

Dr. Wagner found that while Plaintiff's mood was depressed, her thought processes were clear. (R. 103.) With respect to Plaintiff's mental status examination, Plaintiff *inter alia* had a good

---

[11] Anhedonia is a sexual dysfunction in women and the cause is likely to be depression. *Merck,* at 1983.

ability to relate on a personal level, answered all questions competently, did not have any delusions or hallucinations, and possessed good insight and judgment. (R. 103.) Dr. Wagner, however, diagnosed Plaintiff with a major depressive disorder of moderate intensity, with moderate impairment in social and occupational functioning. (R. 104.)

On September 10, 1999, Plaintiff also underwent a physical examination with Dr. Peter Biale, M.D. (internist), a state consultative examiner. (R. 115-17.) Plaintiff told Dr. Biale that she had been suffering from back pain for several years. (R. 115.) Plaintiff stated that her back pain is aggravated when bending over, lifting more than ten or twenty pounds, walking more than a block, climbing a flight of stairs, and sitting or standing for half of an hour. (R. 115.) She reported that she took over-the-counter medications that were not effective. (R. 115.)

Dr. Biale examined Plaintiff's back and noted that she had a full range of motion with respect to her cervical and dorsal spines. (R. 116.) Plaintiff's lumbosacral spine, however, was limited with flexion at 60 degrees and extension at 20 degrees. (R. 116.) Dr. Biale further noted that lateral flexion was also limited at 20 degrees bilaterally and there was tenderness in Plaintiff's paraspinal muscles. (R. 116.) Plaintiff's straight leg raising test was negative and no muscle spasms were noted. (R. 116.) Dr. Biale further observed that Plaintiff was in no distress and exhibited no gross mood disorder. (R. 115-16.)

Plaintiff told Dr. Biale that, during the last two to three years, she had problems with her knees when she walks, climbs or stands. (R. 115.) Dr. Biale conducted a musculoskeletal examination of Plaintiff and determined that she had full range of motion in her leg joints and there was no redness, swelling or thickening of the joints noted. (R. 116.) Dr. Biale also found that Plaintiff could bear her full weight and had a normal gait. (R. 116.) Moreover, Plaintiff's reflexes

were normal and her motor strength was intact. (R. 116.)

Dr. Biale assessed Plaintiff as having low back pain and lumbosacral spine limitations such that her pain exacerbates when she bends over, lifts more than ten pounds, walks more than one block, climbs more than one flight of stairs, and sits or stands for half of an hour. (R. 117.) Dr. Biale further assessed Plaintiff as having painful knees, especially when she walks or climbs. (R. 117.) Although her examination revealed a full range of motion, her knee movements were painful and she was not able to walk heel-to-toe or squat down. (R. 117.) Dr. Biale also noted that Plaintiff had a history of being treated for depression. (R. 117.)

On September 16, 1999, Dr. Carl Hermsmeyer, Ph.D., a state agency reviewing psychologist, reviewed Plaintiff's medical record and diagnosed her as having a major depressive disorder of moderate intensity. (R. 129.) Dr. Hermsmeyer also assessed Plaintiff as being moderately limited in her ability to understand, remember and carry out detailed instructions as well as slightly limited in her activities of daily living and in maintaining social functioning. (R. 125, 127.) She, however, seldom had deficiencies of concentration, persistence or pace that would result in her failing to complete tasks in a timely manner. Dr. Hermsmeyer also noted that there was insufficient evidence in the record to determine whether Plaintiff showed episodes of decompensation. (R. 125.) Furthermore, Dr. Hermsmeyer noted that Plaintiff has the mental capacity to perform simple tasks. (R. 129.)

On September 22, 1999, Dr. Earl W. Donelan, M.D., a reviewing state agency physician, reviewed Plaintiff's medical record and determined that she could lift fifty pounds occasionally and twenty-five pounds frequently. (R. 132.) Moreover, Dr. Donelan found that Plaintiff could sit, stand and walk for about six hours in an eight-hour workday, and assessed Plaintiff as having unlimited

pushing and pulling capabilities. (R. 132.) Dr. E.C. Bone, M.D., another state agency reviewing physician, concurred in Dr. Donelan's assessment of Plaintiff which found that she was capable of performing at least light work, if not medium-level work. (R. 23, 132, 138.)

On November 8, 1999, Plaintiff underwent an evaluation at the Northwest Mental Health Center with Judi Slattery, LCPC.[12] (R. 152.) At that time, Plaintiff discussed her grief from the loss of her second husband and the dissatisfaction and frustration she has with her third husband. (R. 152.) Plaintiff also expressed concern over her physical condition (i.e., her back pain) and indicated that she was seeking treatment for it.[13] (R. 152.)

From approximately December 1999 through February 2000, Plaintiff underwent rehabilitative physical therapy treatment at Creative Therapy Resource, Ltd. with Jeanne Cleary (physical therapist). (R. 147-59, 161.) When Plaintiff was initially assessed on December 14, 1999, she had major[14] extension and moderate[15] flexion problems associated with her lumbar spine. (R. 155.) Physical therapy progress notes from January 3, 2000 to February 17, 2000 indicated that she suffered from moderate extension and minimal[16] flexion losses in her lumbar spine and had pain in her neck, lower back, right thigh and bilaterally in her knees. (R. 147-51, 157-61.) Progress notes

---

[12]LCPC stands for Licensed Clinical Professional Counselor.

[13] On January 6, 2000, Plaintiff was seen, again, at the Northwest Mental Health Center. (R. 152.) At that time, her treatment goals were discussed and it was noted that she had been diagnosed with a depressive disorder and partner relational problems. (R. 152.)

[14]Major is defined as approximately a seventy-five percent loss of normal movement. (R. 151.)

[15]Moderate is defined as approximately a fifty percent loss of normal movement. (R. 151.)

[16]Minimal is defined as approximately a twenty-five percent loss of normal movement. (R. 151.)

also indicated that initially Plaintiff demonstrated some non-compliance with her physical therapy

program (i.e., Plaintiff did not perform her home exercises). (R. 147-151.) However, when Plaintiff

did comply with her program, progress notes indicate that she showed improvement, in that, she

progressed from a major loss of extension to only a moderate loss of extension with respect to her

lumbar spine.[17] (R. 147-51, 155.) Cleary also noted that Plaintiff would benefit from a strengthening

program and an increase in her overall activity level.[18] (R. 159, 161.)

## III. THE ALJ'S FINDINGS AND DECISION HEREIN

The ALJ determined that Plaintiff has not engaged in any substantial gainful activity at any

---

[17]Plaintiff testified, however, that her physical therapy treatment did not really improve her condition. (R. 225.)

[18]The administrative record also contains additional medical evidence, as follows:
In September 2000, Dr. Goldstein saw Plaintiff, at which time, she reported that she was applying for disability benefits, undergoing physical therapy for back pain, and had left knee pain (grinding at extension). (R. 171.) Plaintiff indicated that she was not taking any medication to relieve the pain. (R. 171.)
In April 2000, Plaintiff was diagnosed with an ovarian cyst and an enlarged uterus with multiple fibroids by Dr. S. Eugene Nam, M.D. (R. 164.) Moreover, in September 2000, Dr. Goldstein confirmed Dr. Nam's diagnosis and also found that Plaintiff suffered from recurrent allergic rhinitis and osteoarthritis with grinding of her knees. (R. 169, 170-73.)
On August 31, 2000, Plaintiff was in a second automobile accident which resulted in back and neck pain as well as muscle spasms. (R. 175-76.) Dr. Goldstein prescribed Relafen (a drug used for the treatment of osteoarthritis and rheumatoid arthritis). (R. 176.)
Moreover, in February 2001 (after the ALJ's January 23, 2001 decision), Dr. Carey B. Dachman, M.D. (rheumatologist), diagnosed Plaintiff with spinal stenosis, facet disease and back arthritis. (R. 186.) Dr. Dachman found that Plaintiff had slight paraspinal muscle spasms in her lower spine, significant calf tightness, decreased range of motion in her neck, bilateral shoulder impingement, and slight pelvic malalignment. (R. 187.) He also determined that Plaintiff had more than a fifty percent reduced capacity to sit, pull, bend, turn, stand, climb, stoop, push, and travel on public transportation. (R. 189.) Dr. Dachman further opined that Plaintiff is limited by twenty to fifty percent in her capacity to walk and is restricted from lifting more than five pounds at a time. (R. 189.)
From February through June 2001, Plaintiff attended community counseling sessions for her depression. (R. 191.)

time relevant hereto.[19] (R. 24.) The medical evidence establishes that Plaintiff suffers from major depression and back disorders (i.e., discogenic and degenerative diseases), but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (R. 24.)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's RFC to determine what she could do despite her limitations. (R. 24.) The ALJ determined that Plaintiff has the RFC to perform the exertional and non-exertional requirements of light work because she can stand and walk for seven hours in a day and occasionally lift twenty pounds. (R. 24.) The ALJ found that Plaintiff's past work as a waitress and bartender did not require that she perform work-related activities beyond these stated capabilities. (R. 24.) The ALJ determined that Plaintiff's impairments did not prevent her from performing her past relevant work. (R. 24.) The ALJ, therefore, concluded that Plaintiff was capable of performing full-time work as a waitress and bartender. (R. 23.)

Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act. (R. 24.)

## LEGAL STANDARDS

### I.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

---

[19]The ALJ, in his decision, found that Plaintiff's part-time work as a waitress and bartender does not constitute substantial gainful activity. (R. 18.)

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.    STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the Act. *See* 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of

impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision finding that she is not disabled.

Upon review of the record, the Court finds that an outright reversal is not warranted. Separately, as it relates to remand, Plaintiff alleges that: (1) the ALJ erred in finding that Plaintiff has the RFC to perform light work; (2) the ALJ erred in rejecting evidence of Plaintiff's mental impairment; and (3) the ALJ erred in his credibility finding of Plaintiff. (Pl.'s Mem. at 6.)

## I.    THE ALJ ERRED IN HIS RFC FINDING OF PLAINTIFF.

Plaintiff avers that the medical evidence does not support the ALJ's finding that she is capable of performing light work and her past job as a waitress, which was structured so that she did not have to lift heavy items and so she only had to work two days a week. (Pl.'s Reply at 1.) Plaintiff asserts that the ALJ disregarded medical evidence that was favorable to her and ultimately substituted it with his own lay opinion. (*Id.* at 1-2.) Therefore, Plaintiff contends that the ALJ, in making his decision, ignored medical reports regarding the severity of her impairments and erroneously made independent medical findings. (*Id.* at 2.)

Defendant, on the other hand, contends that the ALJ properly considered all of the evidence and reasonably concluded that Plaintiff was capable of performing light work. (Def.'s Mem. at 5.) The Defendant asserts that, in making his RFC assessment, the ALJ reviewed the objective medical evidence as well as Plaintiff's subjective complaints and determined that she was not limited to the degree she alleged. (*Id.* at 6.) Thus, despite Plaintiff's complaints of disabling pain, the ALJ, Defendant maintains, reasonably concluded that the medical evidence failed to substantiate her claims. (*Id.*)

### A.    THE ALJ IMPERMISSIBLY IGNORED RELEVANT MEDICAL EVIDENCE.

It is established in Social Security law that an ALJ may not play doctor and substitute his own opinion for that of a physician, or make judgments that are not substantiated by objective medical evidence. *Rohan v. Chater,* 98 F.3d 966, 970-71 (7th Cir. 1996). In other words, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings. *Id. See also Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990), *cert. denied,* 502 U.S. 901, 112 S.Ct.

278, 116 L.Ed.2d 230; *Scivally v. Sullivan,* 966 F.2d 1070, 1076 (7th Cir. 1992). An ALJ will be reversed in those cases where the ALJ impermissibly played doctor by failing to address relevant evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001).

Defendant initially avers that the medical evidence does not substantiate Plaintiff's subjective complaints of disabling pain because she only has insignificant mild degenerative changes in her spine. (Def.'s Mem. at 6-8.) Moreover, Defendant asserts that Dr. Jaglan found *inter alia* that her spinal range of motion was well-preserved, she did not exhibit muscle weakness or muscle atrophy, she had normal strength, and her reflexes were intact. (Def.'s Mem. at 6, R. 100-01.)

The Court notes, however, that the evidentiary record reflects additional objective medical evidence identified by Dr. Jaglan that the ALJ failed to address. (R. 19.) For instance, Dr. Jaglan determined that Plaintiff has progressive pain in her lower back and cervical spine, neck pain when she turns her neck to the right, and cervical spinal disease involving moderate to severe disk degeneration of the C5-6 interval, with osteophytes spurring, narrowing of the disc and posterior osteophyte formation. (R. 19, 100.) Dr. Jaglan specifically diagnosed Plaintiff with cervical spondylosis, with disc degeneration of C5-6, based on an X-ray evaluation. (R. 100.)

Defendant next contends that the ALJ properly considered Dr. Biale's objective medical findings. (Def.'s Mem. at 8.) For example, Dr. Biale found that Plaintiff *inter alia* had a full range of motion in her dorsal and cervical spines and leg joints, her straight leg raising test was negative, her reflexes were normal, she could bear her full weight, and she had a normal lumbar curvature. (Def.'s Mem. at 8; R. 20, 115-17.) Moreover, Defendant avers that while the ALJ relied on Dr. Biale's objective medical findings which failed to substantiate Plaintiff's purported limitations, Plaintiff primarily relies on her own self-reporting of her symptoms as evidence of her alleged

impairments.[20] (Def.'s Mem. at 8.)

The Court notes, however, that the record establishes that there is other objective medical evidence identified by Dr. Biale that is potentially favorable to Plaintiff that the ALJ either ignores or fails to address in his decision. (R. 20.) For instance, Dr. Biale *inter alia* found that Plaintiff's lumbosacral spine was limited with flexion at 60 degrees and extension at 20 degrees (lateral flexion was also limited at 20 degrees bilaterally, with tenderness in the paraspinal muscles), she was not able to walk heel-to-toe, and she could not squat down. (R. 20, 116.) Dr. Biale further assessed Plaintiff as having low back pain, pain in her knees, and lumbosacral spine limitations such that her pain exacerbates when she bends over, lifts more than ten pounds, walks more than one block, climbs more than one flight of stairs, and sits or stands for half of an hour. (R. 117.)

In September 2000, Dr. Goldstein assessed Plaintiff as having pain in her left knee and found that there was grinding present in her knees at extension. (R. 171.) The ALJ rejects or discredits this evidence because Plaintiff did not provide X-ray evidence of either joint space narrowing or significant bony destruction in her left knee which is needed to determine if she meets the listing for osteoarthritis. The Court finds, however, that based on Dr. Goldstein's findings of knee pain and knee grinding, the ALJ should have ordered this X-ray evaluation instead of ignoring this evidence that may be potentially favorable to Plaintiff.

Next, the Court notes that the ALJ concluded that because Plaintiff's spinal mobility had been enhanced as a result of her physical therapy treatment, she was capable of performing light work. (R. 20-21.) Specifically, the ALJ notes that Plaintiff's physical therapy treatment was

---

[20]The Court disagrees with Defendant's assertion that Dr. Biale's medical assessment/diagnosis (R. 117) was based on Plaintiff's self-reporting of her alleged impairments. Rather, Dr. Biale based his medical assessment/diagnosis on his examination of Plaintiff as well as his medical expertise.

successful in improving Plaintiff's spinal mobility because her initial evaluation revealed a major extension loss and a moderate flexion loss with respect to her lumbar spine, but her final report reflected that she only suffered from a moderate extension loss in her lumbar spine. (R. 20-21.) However, even though Plaintiff's physical therapy treatment may have been effective in enhancing or improving her spinal mobility, the fact remains that a moderate extension loss amounts to approximately a fifty percent loss of normal movement. (R. 151.) Thus, the ALJ failed to address how a fifty percent loss of movement would affect Plaintiff's ability to perform light work.

The Court finds that a reasonable inference can be made that sufficient medical evidence which the ALJ ignored or failed to address may substantiate Plaintiff's subjective complaints of pain and limitations. To recapitulate, for example, Plaintiff specifically complains that she has severe back pain, neck and knee pain, and that she cannot stand too long or walk to far without triggering pain in these areas. (R. 209-10.) Plaintiff states that she also refrains from bending over, stooping and crouching, and her pain is constant whether she is standing, sitting, or walking. (R. 209-11.) Moreover, Plaintiff testified that she only works two days a week (4 hours each day) because of her pain, and is only able to perform minimal daily activities. Therefore, based on Dr. Jaglan's X-ray evaluation which shows that Plaintiff suffers from cervical spondylosis with disc degeneration of C5-6; Dr. Biale's findings and assessment that she cannot walk heel-to-toe or squat down and has low back pain, pain in her knees, and lumbosacral spine limitations such that her pain exacerbates when she bends over, lifts more than ten pounds, walks more than one block, climbs more than one flight of stairs, and sits or stands for half of an hour; Dr. Goldstein's findings that she has grinding of her knees at extension; and her physical therapy treatment progress notes indicating that she has a fifty percent loss of extension in her lumbar spine, Plaintiff's allegations of disabling pain and limitations

may, in fact, be substantiated by objective medical evidence in the record.

Accordingly, the Court finds that the ALJ erred by impermissibly playing doctor when he ignored and failed to address relevant medical evidence. *Dixon*, 270 F.3d at 1177. In failing to address relevant evidence favorable to Plaintiff, the ALJ appears to have implicitly relied on other evidence in the record which was unfavorable to Plaintiff. *See e.g., Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1983) (a court will remand a cause if the ALJ fails to give at least a minimal articulation of why the claimant's line of evidence was rejected). Thus, while the ALJ mentions or lists much of the medical evidence, he fails to articulate his basis for either crediting or rejecting specific diagnoses and assessments.[21] *See e.g., Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(an ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'")(citation omitted). In other words, the ALJ never attempts to explain why the evidence that is favorable (e.g., an X-ray evaluation diagnosing Plaintiff with cervical spondylosis, with disc degeneration of C5-6 (R. 100-01)) to Plaintiff is overcome by evidence that is unfavorable. Moreover, even though an ALJ may reject a physician's opinion if it appears to be based on a claimant's exaggerated subjective complaints, herein, the ALJ improperly either entirely ignored or (at a minimum) failed to address relevant evidence that potentially substantiated Plaintiff's claims. *See e.g., Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Therefore, a remand is warranted on this issue.

The Seventh Circuit's decision last month in *Golembiewski v. Barnhart*, No. 02-1286, 2003

---

[21]In his decision, the ALJ states, "[a]fter carefully considering the entire record as well as the claimant's subjective complaints of disabling symptoms and limitations, the Administrative Law Judge finds that a reasonable conclusion is that [Plaintiff] retains the capacity to perform the extertional requirements of light level work . . ." (R. 22.)

WL 262059 (7th Cir. Feb. 3, 2003) is squarely applicable on this issue. In that case, the court

remanded the cause to the Commissioner for further proceedings, *inter alia,* because:

> "[t]he ALJ ignored significant [medical] evidence supporting his claim. The ALJ
> must evaluate the record fairly. Thus, although the ALJ need not discuss every piece
> of evidence in the record, *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001),
> the ALJ may not ignore an entire line of evidence that is contrary to the ruling,
> *Zurawski,* 245 F.3d at 888. Otherwise it is impossible for a reviewing court to tell
> whether the ALJ's decision rests upon substantial evidence. *Smith v. Apfel,* 231 F.3d
> 433, 438 (7th Cir. 2000). A remand is required here because the ALJ improperly
> ignored . . . lines of evidence." 2003 WL 262059, at *4, 5.

## B. THE ALJ IMPERMISSIBLY REJECTED EVIDENCE OF PLAINTIFF'S MENTAL IMPAIRMENT.

Plaintiff avers that the ALJ erroneously rejected all favorable evidence of her mental

impairment and ultimately concluded that she does not have "any mental limitations at all"and "has

no limitations in her ability to perform the mental demands of any occupation." (Pl.'s Reply at 8; R.

22-23.) Defendant, on the other hand, asserts that the ALJ properly evaluated Plaintiff's alleged

mental impairment and found the medical assessments were not substantiated by the record and were

inconsistent with Plaintiff's daily activities and social functioning. (Def.'s Mem. at 11.)

Dr. Wagner determined that Plaintiff suffered from a major depressive disorder of moderate

intensity with moderate impairment in social and occupational functioning. (R. 104.) Dr. Wagner

further found that Plaintiff's poor motivation and depressive symptoms impaired her activities of

daily living. (R. 103.) Based on Plaintiff's clinical evaluation and other evidence in the case,

however, the ALJ found Dr. Wagner's assessment unsubstantiated because he "did not specify the

basis for or the extent of [Plaintiff's] purported impairments." (R. 19-20.)

Defendant avers that the ALJ reasonably concluded that Dr. Wagner's assessment was not

supported by the record and correctly rejected his assessment based on Plaintiff's activities. (Def.'s

Mem. at 7, 11; R. 19-21.) For instance, the ALJ notes that Plaintiff's daily activities entail cooking, cleaning, doing laundry, shopping, occasionally going to movies and restaurants with friends, and working as a bartender/waitress one to two days per week.[22] (R. 19, 21.) The ALJ also points out that Plaintiff relates well to her customers and examining physicians, and is cordial and friendly to everyone. (R. 21.) The ALJ also noted that Plaintiff was not adverse to socializing, had good social skills, and enjoyed being with people.[23] (R. 20-21; Ex. 5E.) Defendant thus contends that the ALJ reasonably concluded that any compromise in Plaintiff's social and occupational functioning was not justified and noted that Dr. Wagner remained vague on how Plaintiff's daily routine was affected by depression "[g]iven that [Plaintiff] does everything that is needed for a normal life and even works part-time in a job that demands that she is affable and pleasant with other humans, [therefore,] any limitation in her activities of daily living [is] invisible to the Administrative Law Judge." (Def.'s Mem. at 11; R. 20-21.)

Dr. Hermsmeyer also diagnosed Plaintiff with a major depressive disorder of moderate

---

[22]The Court notes that the ALJ to some extent misstates the record. For instance, Plaintiff reported to Dr. Wagner that she only does what she has to do and she is somewhat able to cook, clean, do laundry and shop. (R. 103.) While Plaintiff reported having many friends, occasionally going to movies and restaurants, working two days per week as a bartender and waitress, she also stated that she spends the majority of her day in her home doing housework. (R. 103.) Moreover, at the administrative hearing, Plaintiff testified to greater limitations with respect to her daily activities than what she had reported to Dr. Wagner. (R. 211-14.)

[23]Defendant asserts that it was Plaintiff's own reporting that undermines Dr. Wagner's conclusions regarding Plaintiff's ability to socialize. (Def.'s Mem. at 11; R. 84.) Plaintiff, however, contends that Defendant misstates the record because after the onset of her disabling condition, she stated (in response to a question about whether she enjoyed people and liked to be with others) that "*Now*, I am at home a lot and not able to socialize with people so much." (Pl.'s Reply at 9; R. 84) (emphasis added). Plaintiff, therefore, asserts that contrary to Defendant's contention, she is not able to socialize anymore which supports Dr. Wagner's finding that she suffers from a major depressive disorder of moderate intensity. (Pl.'s Reply at 9.)

intensity and found that she was moderately limited in her ability to understand, remember and carry out detailed instructions, slightly limited in her activities of daily living and in maintaining social functioning, seldom had deficiencies of concentration, persistence or pace, showed no episodes of decompensation,[24] and could perform simple tasks. (R. 125, 127, 129.) Defendant contends, however, that the ALJ reasonably rejected Dr. Hermsmeyer's assessment because the record did not support even those minimal limitations that he found. (Def's Mem. at 12.) Thus, according to Defendant, the ALJ reasonably rejected Dr. Hermsmeyer's assessment because it was inconsistent with the record. (*Id.* at 14.) For instance, in his decision, the ALJ states:

> [W]ithout explanation [Dr. Hermsmeyer] believed that [Plaintiff] had slight restrictions of [her] activities of daily living and in social functioning. Deficiencies of Concentration [and] Persistence of Pace were seldom and no episodes of decompensation were noted by this psychologist. Although slight and seldom functional deficiencies are of no significant consequence to the outcome of this case, even these de minimus findings remain unsupported. Still, Dr. Hermsmeyer's opinion only slightly differs from that of the Administrative Law Judge and therefore remains a *valuable ally* to the results reached in this decision. (R. 22.) (emphasis added).

The Court agrees with Plaintiff and finds that the ALJ impermissibly substituted his opinion for that of Drs. Wagner and Hermsmeyer when he rejected favorable evidence of Plaintiff's mental impairment. Both Drs. Wagner and Hermsmeyer found that Plaintiff suffered from a major depressive disorder of moderate intensity and was restricted to some degree in her daily activities and social functioning. (R. 104, 125.) The ALJ, however, concluded that, despite these assessments, the fact that Plaintiff could perform some minimal daily activities, was able to socialize on a limited basis, was cordial and friendly, and worked two days per week as a bartender and waitress meant that

---

[24]The ALJ misstates the record, in that, Dr. Hermsmeyer did not find that Plaintiff showed no episodes of decompensation; rather, he indicated there was insufficient evidence to make a determination regarding this particular limitation. (R. 125.)

the physicians' assessments were unsubstantiated and inconsistent with the record. Herein, the ALJ ultimately rejects the physicians' findings and concludes that Plaintiff has no mental impairment at all. (R. 24.) *See e.g., Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)("Without relying on any medical evidence or authority, the ALJ determined that [the plaintiff's] efforts at engaging in a small machine repair/resale business were incompatible with a diagnosis of major depression and [the physician's] conclusions regarding [the plaintiff's] functional abilities").

The case of *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995) is instructive. In *Wilder*, the ALJ believed that the claimant's ability to work as a security guard and carry a gun were inconsistent with a diagnosis of depression. The Seventh Circuit, however, held that this was not a permissible ground upon which the ALJ could rely. *Id.* at 337-38. The Court explained:

> Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it. [Wilder] is entitled to a decision based on the record rather than a hunch. The salient fact of record is the testimony of the psychiatrist, a disinterested as well as expert witness. Everything else is rank conjecture. *Wilder*, 64 F.3d at 337-38.

As in *Wilder*, the Court finds that the ALJ's basis for rejecting Drs. Wagner's and Hermsmeyer's assessments is impermissible. Accordingly, the Court finds that the ALJ played doctor by impermissibly supplanting the physicians' medical assessments with his own independent medical judgment. Therefore, a remand on this issue is warranted.[25]

## II.     THE ALJ ERRED IN HIS CREDIBILITY FINDING OF PLAINTIFF.

Plaintiff asserts that the ALJ failed to make a credibility finding based on Plaintiff's subjective complaints and symptoms in accordance with SSR 96-7p and erred in finding her not

---

[25]On remand, the ALJ is instructed to re-contact Dr. Wagner to clarify the limitations regarding Plaintiff's moderate social and occupational functioning. *See e.g.*, 20 C.F.R. § 404.1527(c)(3).

credible based on her activities. (Pl.'s Reply at 11.) Defendant, on the other hand, contends that the ALJ considered Plaintiff's subjective complaints of pain in accordance with the factors specified in SSR 96-7p and concluded that she was not fully credible because her activities were inconsistent with her purported limitations. (Def.'s Mem. at 14-15; R. 22.)

An ALJ's credibility findings will not be overturned by a court unless they are "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, a decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)(*citing* SSR 96-7p); *Golembiewski*, 2003 WL 262059, at *2-4. Thus, the ALJ is required to state which of the plaintiff's complaints he rejected and why such complaints were unsupported by the record. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Defendant first avers that the ALJ found Plaintiff not credible because she did not receive medical treatment and was not taking medication for her impairments between 1996 and 1999. (Def.'s Mem. at 15; R. 22.) The ALJ found Plaintiff not fully credible because she claimed "incapacitating orthopedic pain" yet "she seeks no relief from it in analgesic medication."[26] (R. 22.)

Herein, SSR 96-7p is applicable in Plaintiff's favor. SSR 96-7p provides in pertinent part,

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits

---

[26]The ALJ noted that the only medication Plaintiff took was Zoloft. (R. 22, 219, 227.) The Court notes, however, that Plaintiff reported taking Doan's back pills, Tylenol and Advil for her pain. (R. 83.)

or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. SSR 96-7p.

Moreover, SSR 96-7p sets forth examples for why a claimant may chose not to seek medical treatment; such as, "the individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms . . . [or that] the individual may be unable to afford treatment and may not have access to free or low-cost medical services." *See id.*

The Court finds that the ALJ did not question Plaintiff at the administrative hearing or at a later time regarding the fact that she had not sought medical treatment on a regular basis for her impairments. In addition, Plaintiff testified that she has a very high health insurance deductible which may have precluded her from seeking regular medical treatment. In fact, Plaintiff has a $5,000.00 deductible which exceeds or nearly exceeds her annual income.[27] (R. 219.) Accordingly, because there is insufficient evidence in the record regarding Plaintiff's reason(s) for not seeking medical treatment (other than the fact that Plaintiff has a very high health insurance deductible), the ALJ should have sought out additional information and developed the record in this area in order to properly assess Plaintiff's credibility.

Defendant next contends that the ALJ found Plaintiff not credible based on her ability to "work[] part-time in the strenuous roles of a waitress and bartender." (Def.'s Mem. at 15; R. 22.) For instance, Plaintiff testified that she could not stand for more than half an hour at a time or walk

---

[27]Plaintiff made $4,924.00 in 1996; $4,278.00 in 1997; $1,121.12 in 1998; and $5,353.52 in 1999. (R. 18.)

for more than half a block, yet she worked four hour shifts and she never got a break. (R. 208, 210-11, 221.) Defendant thus avers that Plaintiff's testimony regarding her limitations was inconsistent with her part-time work as a bartender and waitress. (Def.'s Mem. at 15.)

With regard to Defendant's contention, the Court finds that the ALJ mischaracterized Plaintiff's part-time work as a waitress and bartender. First, Plaintiff structured her work activities to accommodate her impairments because she only works two days per week (i.e., four hours each day) and has the bus boys at Fellinis Restaurant carry the large trays of food to the tables. (R. 210, 220.) Next, the fact that Plaintiff can perform some work activities on a limited basis does not mean that she is capable of performing full-time work. Furthermore, and respectfully, Defendant misstates the record by asserting that Plaintiff worked twelve hours a day, six days a week during the period she alleges disability, despite the fact that the record indicates that she was referring to her work prior to the onset of her disability. (R. 75-76.)

The Court next notes that Plaintiff's statements regarding her limitations and what she does as a bartender and waitress are not inconsistent. For instance, Plaintiff's statements that she works four hours on her feet (two days a week) is not inconsistent with her complaints of disabling pain because she stated she is in constant pain and discomfort. (R. 219-223.) Plaintiff testified that during her four hour shift, she was on her feet, "[t]he whole time" and "[she] never had a break . . . even on the full time times." (R. 220-221.) After a four hour shift, Plaintiff has pain all over, numbness, and collapses because she cannot do anything more than recuperate before working her shift again. (R. 221-22.) Plaintiff stated that she is "beat up" after working, her body is very sore and she is never able to recover. (R. 222.) Furthermore, Plaintiff stated that, at times, she would "force" herself to go in and work additional days because she needed the money, but that she could

not do that for any length of time.[28]  (R. 223.)

Defendant further asserts that the ALJ properly found that Plaintiff was not credible because her daily activities were inconsistent with her "professed symptoms." (Def.'s Mem. at 14-15; R. 22.) The ALJ noted that Plaintiff's daily activities entailed cooking, cleaning, doing laundry, shopping, driving five miles per week, and attending to personal hygiene. (Def.'s Mem. at 15; R. 19, 22, 211-14.)  The ALJ further found that Plaintiff has many friends, occasionally goes to movies and restaurants, has good social skills, and enjoys being with people.[29]  (R. 20-21; Ex. 5E.)

Plaintiff's daily activities, however, are fairly restricted and not the kind of activities that necessarily undermine or contradict a claim of disabling impairments.  *See, e.g. Zurawski,* 245 F.3d at 887; *Clifford,* 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity").  Thus, the ALJ's analysis of Plaintiff's daily

---

[28]Defendant further avers that Plaintiff's purported limitations and complaints of pain are not credible because she showed "no evidence of any pain while attending the hearing." (Def.'s Mem. at 14-15; R. 22.)  For instance, the ALJ, in his decision, noted that "[Plaintiff] sat comfortably for an hour or so after driving [five] miles to the Evanston Hearing Office. [Plaintiff] then smoothly exited the hearing room . . ." (*Id.*)  The Court notes, however, that during the administrative hearing, Plaintiff testified that she was having pain from sitting and had to move around to accommodate her pain.  (R. 226.)

[29]At the administrative hearing, Plaintiff testified to greater limitations with respect to her daily activities than what she had reported to Dr. Wagner. Plaintiff testified that she cooks, does light household chores (e.g., laundry) and shops. (R. 212-14.)  She stated that she shops for food because it is hard for her to go out and eat because she cannot sit for very long. (R. 212.) Plaintiff indicated that other than shopping she essentially stays at home. (R. 212-13.)  She stated that she could not remember the last time she went to a movie (a movie is too long to sit through) and that she preferred to watch television at home because that way she could lay down or move around. (R. 212-13.)  Plaintiff further testified that she attends to her personal hygiene; however, it is difficult for her to take a shower and get dressed. (R. 212.)  She also indicated that she drives only about five miles per week because it is hard for her to get out of the car because of her back. (R. 211.) Moreover, Plaintiff testified that her daughter comes to visit once a month and helps her take care of things. (R. 213-14.)

activities does not necessarily equate with her ability to perform the full range of extertional and non-exertional work-related activities. *See, e.g., Brown v. Massanari*, 2001 WL 1315075, *2 (N.D. Ill. Oct. 26, 2001); *O'Connor v. Sullivan*, 938 F.2d 70, 74 (7ᵗʰ Cir. 1996).

Therefore, the ALJ erred in his credibility determination by finding that Plaintiff's complaints of disabling functional limitations were not credible. *See, e.g., Zurawski*, 245 F.3d at 887-88; *Clifford*, 227 F.3d at 870-72. Put differently, for the aforesaid reasons, the Court finds the ALJ erred in his credibility finding of Plaintiff. *See e.g., Clifford*, 227 F.3d at 872; *Zurawski*, 245 F.3d at 887-88. Accordingly, a remand on this issue is warranted.

## III. THE ALJ SHOULD HAVE OBTAINED TESTIMONY FROM A MEDICAL EXPERT.

The procedure for adjudicating a social security disability insurance benefits claim differs significantly from the adversarial model. *Green v. Apfel*, 204 F.3d 780, 781 (7ᵗʰ Cir. 2000). The procedure requires the ALJ to summon a medical expert if there is not an adequate medical basis in the record for determining whether the claimant is disabled. *See id.* (stating that the procedure for adjudicating social security disability claims "requir[es] the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") *See also* 20 C.F.R. § 404.1527(f)(2)(iii)(an administrative law judge may also ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairments.) In *Green*, "[t]he administrative law judge refused to believe [the plaintiff's] 'complaints of debilitating pain and limitations' because they were disproportionate to the objective medical findings in the record." *See id.* The ALJ, however, did not summon a medical expert. *See id.* Accordingly, the case was remanded by the Seventh Circuit to the Commissioner for further proceedings.

Herein, similar to *Green,* because the ALJ believed that Plaintiff's subjective complaints of pain and limitations were not reasonably supported by the medical evidence, he should be required to summon a medical expert or experts to provide an informed basis for determining whether Plaintiff was disabled. Accordingly, because the ALJ lacked an informed basis necessary to make his decision and ultimately, played doctor by making an independent medical judgment, a remand is warranted. *See e.g., Zurawski,* 245 F.3d at 889. Accordingly, on remand, the ALJ is instructed to obtain testimony from a Medical Expert.[30]

## CONCLUSION[31]

In view of the foregoing, the Court grants Plaintiff's Motion for Summary Judgment or Remand insofar as it requests a remand and denies Defendant's Motion for Summary Judgment. Accordingly, the cause is remanded to the Commissioner for further proceedings consistent with this opinion.

---

[30]On remand, the ALJ is further instructed to obtain testimony from a Vocational Expert. *See e.g., May v. Apfel,* No. 98 C 1647, 1999 WL 1011927, *10 n.42 (N.D. Ill. Sept. 30, 1999) (When a claimant suffers from both exertional and nonexertional impairments the ALJ may not be able to rely solely on the grid rules and may use a vocational expert.) The use of a grid is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he or she can perform. *Allen v. Sullivan,* 977 F.2d 385, 389 (7th Cir. 1992).

[31]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein. The parties may, for example, present their arguments with respect to whether the ALJ erred in relying on the opinions of the state agency reviewing physicians and as to Plaintiff's need to take breaks (and whether she can stoop) to the ALJ upon remand. (*See* Pl.'s Mem. at 8-9; Def.'s Mem. at 8-10; Def.'s Reply at 6-7.)

ENTER:

IAN H. LEVIN
U.S. Magistrate Judge

Dated:   March 20, 2003